James L. BRIGGS, and Harry F. Gibbs, Sr., on behalf of themselves and a class of all persons similarly situated, Plaintiffs,

v.

**THE GOODYEAR TIRE & RUBBER COMPANY, Defendant.**

No. 99–CV–390C.

United States District Court,
W.D. New York.

Dec. 14, 1999.

Steven H. Wodka, Little Silver, NJ, Lipsitz & Ponterio, LLC, John N. Lipsitz, of counsel, Buffalo, NY, for Plaintiff.

Volgenau & Bosse, Diane F. Bosse, of counsel, Buffalo, NY, for Defendant.

## DECISION and ORDER

CURTIN, District Judge.

### INTRODUCTION

On June 8, 1999, plaintiffs James Briggs and Harry Gibbs ("plaintiffs"), representatives of a proposed class, instituted an action against defendant Goodyear Tire & Rubber Company ("Goodyear"). Plaintiffs allege that Goodyear has been and is now unjustly enriched by its refusal to comply with a Release and Settlement Agreement (the Agreement) which Goodyear and plaintiffs entered into with the rest of a plaintiff class and the primary defendants from a prior action. *See* Item 1, ¶ 1. This

court reviewed and approved the Agreement on January 21, 1998. Plaintiffs request that the court impose a constructive trust on Goodyear's assets, thereby compelling Goodyear to comply with the terms of both the Release and Settlement Agreement and the agreed-to medical testing and screening program. *See id.* Goodyear now brings a motion to dismiss plaintiffs' complaint. *See* Item 18. Goodyear's motion to dismiss is based on two grounds: (1) lack of subject matter jurisdiction and (2) plaintiffs' failure to state a claim upon which relief may be granted. *See id.* ¶ 2. For the reasons stated herein, the court now grants Goodyear's motion to dismiss plaintiffs' action.

## BACKGROUND

### I. *Gibbs v. Du Pont*

The present action arises out of *Gibbs v. Du Pont*, 93–CV–0497C (*"Gibbs"*), a case previously before this court. On June 10, 1993 the *Gibbs* plaintiffs commenced an action against the following defendants: E.I. Du Pont, Allied–Signal, First Mississippi, First Chemical, American Cyanamid, and USX Corporation ("the primary defendants"). The *Gibbs* plaintiffs consisted of Harry Gibbs, Robert Bailey, Anthony D'Orazio, William Mooney, Donald St. John, and Deborah Race, who were the representative plaintiffs in the proposed class action lawsuit ("the *Gibbs* plaintiffs"). The *Gibbs* plaintiffs were members of a class of former and retired workers from Goodyear's plant in Niagara Falls, New York. *See Gibbs* Item 1, ¶ 1.

The *Gibbs* plaintiffs claimed that they had suffered on-the-job exposure to the carcinogenic chemicals orthotoluidine and aniline. *See id.* ¶¶ 2, 4. They further alleged that a study conducted by the National Institute of Occupational Safety and Health ("NIOSH") revealed that the plaintiffs' exposure to these chemicals had greatly increased their risk of developing bladder cancer. *See id.* ¶ 4. They asserted that each of the primary defendants had been involved in the manufacture of these chemicals and therefore should be held jointly and severally liable for the plaintiffs' damages on either a theory of negligence or strict products liability. *See id.* ¶¶ 37–40.

In light of the potentially long latency between exposure and manifestation of the cancer, they demanded that the defendants provide them with a program of ongoing medical monitoring. *See id.* ¶¶ 5, 7. In February and March of 1996, the primary defendants impleaded the *Gibbs* plaintiffs' employer, Goodyear, as a third-party defendant. *See* Items 85, 87–89.

On November 12, 1997, the court preliminarily certified the proposed plaintiff class for the limited purposes of evaluating a Release and Settlement Agreement submitted by the parties. On January 21, 1998, the court dismissed the *Gibbs* action and, in so doing, approved the Agreement. *Gibbs,* Item 125.

### II. The *Gibbs* Release and Settlement Agreement

#### A. *The Agreement*

The Agreement was entered into between the *Gibbs* plaintiffs (for themselves and the class), plaintiffs' attorneys, the primary defendants, and Goodyear. *See id.,* Ex. 1, p.1. Among other things, the plaintiffs agreed to release the primary defendants and Goodyear from any other claims based on a need for medical monitoring of bladder cancer. *See id.* at 4. In exchange, the primary defendants agreed to pay attorneys' fees to plaintiffs' attorneys, and Goodyear agreed "to provide and maintain a program of bladder cancer surveillance as set forth in Appendix 'A' ...." *Id.* at 3.

The Agreement also provided that the primary defendants and Goodyear conceded to certification of the *Gibbs* class only for the purposes of settling the action. *See id.* at 7–8. The Agreement expressly provided, then, that the *Gibbs* plaintiffs would never use this consent to certifica-

tion as precedent against the primary defendants or Goodyear or as an admission by the primary defendants or Goodyear. *See id.*

### B. *The Program*

Paragraph one of the Agreement incorporates, by reference, a document entitled "Appendix 'A.'" *Gibbs* Item 125, Ex. 1, p. 3. Appendix "A," which is also referred to as "the Program," contains the provisions and terms of the bladder cancer surveillance program. Under Appendix "A," Goodyear agreed to provide and maintain a program of bladder cancer surveillance for all eligible class members. *See Gibbs* Item 125, Ex. 1, App. A, ¶ 1. Appendix "A" defines eligible class members in this way: "[A]ll former and retired employees of the Goodyear Niagara Falls plant who were employed between January 1, 1957 and June 11, 1990 for more than one year in Department 245" and in various other sites at the Niagara Falls plant. *Id.* ¶ 2.[1]

The purpose of the Program was stated as follows: "[T]o detect cases of bladder cancer at the earliest possible date ... by the use of the most effective, accurate and sensitive medical tests and technology ...." *Id.* ¶ 3. In light of such a purpose, Appendix "A" states that the Program's testing protocol is subject to change when the parties' medical representatives agreed to such changes. *See id.* According to Appendix "A," an arbitrator would resolve disputes between the parties over, among other things, the Program's surveillance protocol and notification efforts. *Id.* ¶¶ 7–8.

## FACTS

### I. Introduction

In the present action, plaintiffs allege that Goodyear has refused to comply with the Agreement and instead has erected "barriers" to participation in the Program in order to minimize the costs of administering the Program. Item 1, ¶¶ 4, 33b; Item 20, p. 1. Plaintiffs allege that Goodyear is being unjustly enriched because it is able to retain funds that should be used for the Program. *See id.* ¶ 4. Plaintiffs further allege that legal remedies would be inadequate because it would be nearly impossible to estimate how much it will cost to run the Program for more than 550 people for over 30 years. *See id.* ¶¶ 37–38; Item 20, p. 2.

Plaintiffs have brought an action in equity asking the court to impose a constructive trust on Goodyear's assets in order to stop Goodyear's unjust enrichment and to compel Goodyear to fund and implement the Program fully. *See* Item 1, ¶ 39.

### II. This Court's Role at the End of *Gibbs*

At the *Gibbs* settlement hearing, the court inquired: "[I]s there—any possibility that this may come back to the Court for any supervision[?]" In response, plaintiffs' counsel, Mr. Steven Wodka, responded: "[W]e have what we call a self enforcing mechanism of arbitration, binding arbitration in the event that there are disputes ...." The court remarked: "[U]nless there is some serious difficulty with the arbitration, then the Court's role is finished"; to which plaintiffs' counsel answered: "[T]hat is correct." Item 18, Ex. F, p. 5, line 21—p. 6, line 7.

In the Agreement, the parties stated that "the United States District Court will not retain jurisdiction to enforce the Agreement set forth in Appendix 'A' following entry" of the court's order. Item 18, Ex. A, p. 9. Furthermore, Appendix "A" of the Agreement provides: "The parties agree that the United States District Court will not retain jurisdiction to enforce this Appendix 'A.'" Item 18, Ex. A, p. 11.

---

1. In addition, Appendix "A" provides for a so-called "opt in" cohort. *See Gibbs,* Item 125, Ex. 1, App. A, ¶ 2.

### III. Alleged Costs and Values of the Program

Plaintiffs' expert witness, Dr. Stephen Markowitz, has stated that if the agreed-to Program were properly implemented, it would cost $265,388 to administer in its first year. *See* Item 20, p. 7 (citing Markowitz affidavit). Goodyear, on the other hand, notes that Dr. Markowitz estimated the annual value of the Program's screening tests for each individual to be approximately $160. Goodyear observes that the value of a lifetime of screening tests for an individual plaintiff, even if they were adjusted for inflation and improvements in technology, would never exceed $75,000.

Plaintiffs, however, claim that they are demanding funds for the Program's "professional infrastructure." Item 20, p. 8. Specifically, plaintiffs allege that the costs of (1) paying professional salaries, (2) reporting results, (3) conducting outreach, (4) educating class members, and (5) collecting and analyzing data would be about $199,468 in the first year alone. Item 20, pp. 7–8. Plaintiffs also allege that the costs of staffing the Program for a year would be over $135,000. Item 20, p.8.

### DISCUSSION

### I. Rule 12(b)(1): Subject Matter Jurisdiction

#### A. *The Court Did Not Retain Jurisdiction Over the Gibbs Agreement*

■ In *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), the Supreme Court addressed the issue of whether a district court had retained ancillary jurisdiction over a court-approved settlement agreement. The Court found that the district court had not retained ancillary jurisdiction over the settlement agreement because the court had only tersely ordered

that the suit be dismissed. *Id.* at 377, 380, 114 S.Ct. 1673. The Court reasoned that:

> The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.

*Id.* at 381, 114 S.Ct. 1673.

In *Scelsa v. City University of New York,* 76 F.3d 37 (2d Cir.1996), the Second Circuit had the opportunity to interpret and apply *Kokkonen,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391. In *Scelsa,* the district court judge had issued a very brief order, wherein he stated that the action was dismissed "except as set forth in the Settlement Agreement among the parties ...." *Scelsa,* 76 F.3d at 39–40. The court held that the district court had not retained jurisdiction over the settlement agreement. First, the court reasoned that the "[d]ismissal [o]rder neither expressly retains jurisdiction over the Agreement nor incorporates its terms. The mere reference in the order to the Agreement does not incorporate the Agreement into the order." *Id.* at 41. The court also supported its holding by reasoning that the district court judge herself had found that she had not retained jurisdiction over the settlement agreement. *Id.* at 42. "[T]here are few persons in a better position to understand the meaning of an order of dismissal than the district judge who ordered it." *Id.*

Other circuit courts have reached the same conclusion when confronted with similar facts. *See, e.g., In re: Phar–Mor, Inc. Securities Litigation,* 172 F.3d 270, 273–75 (3d Cir.1999) (dismissing the action against certain defendants "pursuant to the terms of the Settlement" did not give rise to

incorporation of the settlement agreement into the dismissal order).[2]

The present action is substantially similar to *Kokkonen* and *Scelsa*. Like the district courts in *Kokkonen* and *Scelsa*, this court did not state in its dismissal order that it would retain jurisdiction over the Agreement. *See* Item 18, Ex. E. In fact, at the settlement hearing, the court specifically asked counsel whether the court should expect to retain any continuing jurisdiction over the Agreement. Plaintiffs' counsel, Mr. Wodka, stated that the court would not retain jurisdiction and that the parties had agreed to be bound by a system of arbitration. This exchange between the court and counsel evokes the court's reasoning in *Scelsa*, in which the Court looked to the district court judge's intent in determining whether the district court had retained jurisdiction. 76 F.3d at 42. Clearly, this court did not intend to retain jurisdiction.

■ Admittedly, analyzing the *Gibbs* dismissal order is a more muddied process than it was in either *Kokkonen* or *Scelsa* because *Gibbs*, unlike the leading cases, was a class action. "Unlike an ordinary claim which may be voluntarily dismissed by mere notice to the court, a class claim cannot be dismissed or settled without approval of the court." *Moore's Federal Practice 3d*, § 41.32[1]; *see Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986). Thus, this court in *Gibbs* necessarily undertook a much closer examination of the settlement agreement than did the district courts in either *Kokkonen* or *Scelsa*.

Along this line, plaintiffs argue that the court "embodied" the Agreement in its dismissal order when it:

> Ordered that the Release and Settlement Agreement, appended hereto at Exhibit 1, is HEREBY APPROVED as fair to the Class as a whole pursuant to

Fed.R.Civ.P. 23(e) and its provisions shall apply to and shall bind the Class as a whole and all members of the class

> . . . .

Item 18, Ex. E (*Gibbs* order). Plaintiffs further argue that the court showed an intent to embody the Agreement in the *Gibbs* dismissal order by reviewing the Agreement, holding hearings, approving it, appending it to the order, and stating that the Agreement would bind the class as a whole. Item 20, p. 15.

Yet, in reviewing and approving the Agreement, the court only did what was required of it in a class action settlement. *See* Fed.R.Civ.P. 23(e). In *Arata v. Nu Skin Intern., Inc.*, 96 F.3d 1265 (9th Cir. 1996), the court recognized that a district court does not impliedly retain jurisdiction over a class action settlement agreement simply because it reviews and approves a settlement agreement. *Id.* at 1269.

Like the district courts in *Kokkonen* and *Scelsa*, this court did not incorporate or embody the terms of the Agreement into the dismissal order, *see* Item 18, Ex. E, because the court did not adopt the actual terms of the Agreement *into* the body of the dismissal order. *Cf. DiMucci v. DiMucci*, 91 F.3d 845, 846 (7th Cir.1996) (noting that the district court had "entered a consent judgment that incorporated each of the provisions of the settlement agreement"); *Thanning v. Nassau County Medical Examiners Office*, 187 F.R.D. 69, 71 (E.D.N.Y.1999) (involving a district court judge who simply wrote "so ordered" on the parties' settlement agreement itself). Rather, the court appended the Agreement to the order. This is a relevant difference. Thus, for all the reasons discussed herein, the court concludes that it did not incorporate the actual language of the Agreement into its order and therefore did not retain jurisdiction.

---

2. Plaintiffs argue that the *Gibbs* dismissal order "embodied" the Agreement. However, the Supreme Court's use of the term "embody" in *Kokkonen* appears to have been intended only as a synonym of "incorporate." The court does not read the term "embody" as an invitation to construe a dismissal order as adopting a settlement agreement into the

Finally, in *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243 (S.D.N.Y.1998), the court held that the district court could not have retained ancillary jurisdiction to enforce the class action settlement agreement because "the settlement denies the court retained jurisdiction . . . ." *Id.* at 268. In the present action, both the Agreement and the Program expressly provide that this court would not retain jurisdiction to resolve disputes arising out of administration of the Program. In addition, at the settlement hearing, Mr. Wodka, specifically indicated that the parties had agreed that the court would not be the enforcer of the Agreement.

Therefore, even if the court were to find that it had somehow shown an intent to retain jurisdiction over the Agreement when it made the Agreement part of the record, the court would still defer to the unambiguous intent of the parties to the Agreement that the court would not retain jurisdiction. As such, the court finds that it has not retained jurisdiction over disputes arising from the Agreement.

B. *Plaintiffs Have not Alleged an Independent Basis for Subject Matter Jurisdiction*

Plaintiffs also fail to establish an independent basis of subject matter jurisdiction because they have failed to adequately allege diversity jurisdiction under 28 U.S.C. § 1332(a).

Federal courts are courts of limited jurisdiction, and possess only such power as is authorized to them by the Constitution and statutes. *See Willy v. Coastal Corp.*, 503 U.S. 131, 136–37, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992). Plaintiffs bear the burden of overcoming the presumption that their cause of action lies outside of the federal court's limited jurisdiction. *See Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673. In order to establish subject matter jurisdiction based on diversity, plaintiffs must first allege that there is complete diversity between the plaintiffs and defendants. *See* 28 U.S.C. § 1332(a).[3] Second, a plaintiff in a diversity action must be able to allege that the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). All plaintiffs in a class action must individually satisfy the minimum-amount-in-controversy requirement where the plaintiffs are asserting separate and individual claims. *See Zahn v. International Paper Co.*, 414 U.S. 291, 294–300, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).[4]

However, the "common fund" doctrine represents an exception to *Zahn.* Plaintiffs in a class action may satisfy the jurisdictional minimum by aggregating their claims "when [they] unite to enforce a single title or right, in which they have a common and undivided interest . . . ." *Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1422 (2d Cir.1997). Paradigms of these common fund cases include "claims to a piece of land, a trust fund, an estate, an insurance policy, a lien, or an item of collateral,

order itself. *See Random House Unabridged Dictionary 2d*, at 635.

**3.** In a class action, the court should consider just the citizenship of the named representatives of the class, without regard to whether the citizenship of other members of the class would destroy complete diversity. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 931 (2d Cir.1998). In the present action, there is no dispute that there is complete diversity of citizenship between the representative plaintiffs and Goodyear. *See* Item 19, p. 7; Item 20, p. 5.

**4.** The *Zahn* doctrine applies equally to plaintiffs who bring a class action under Rule 23(b)(3) *and* to plaintiffs who, as in the present action, bring a class action under Rule 23(b)(2). *See Givens v. W.T. Grant Co.*, 457 F.2d 612, 614 n. 4 (2d Cir.), *vacated on other grounds* 409 U.S. 56, 93 S.Ct. 451, 34 L.Ed.2d 266 (1972); *see also* Item 1 (plaintiffs' complaint alleging Rule 23(b)(2) class status). While there is currently disagreement among the circuit courts as to whether *Zahn* is still good law in light of Congress's 1990 passage of 28 U.S.C. § 1367, *see E.R. Squibb & Sons v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 934–35 (2d Cir.1998), every district court in this circuit that has addressed the issue has held that *Zahn* is still good law. *See Greenberg v. Trace National Holdings, Inc.*, 1999 WL 587935, at *3 (S.D.N.Y.).

which [the plaintiffs] claim as common owners or in which they share a common interest arising under a single title or right." *Id.* at 1424.

■ The issue in the present action is whether the plaintiffs may aggregate their claims so as to meet the minimum jurisdictional requirement. After careful consideration, the court holds that aggregation of the plaintiffs' claims against Goodyear would be improper.

Goodyear points out that in the current market, the value of the Program to each individual class member would be approximately $160 per year. This figure represents the costs of administering the screening tests that the Program prescribed. Goodyear posits that even if the court were to adjust for inflation and technological advances, each individual plaintiff could never meet the minimum jurisdictional requirement based on a $160–per–year figure.

Plaintiffs counter that they have actually alleged a common and undivided interest in the *overall costs* of running the Program. Plaintiffs argue that any individual member of the class would not and could not seek a 1/558 share of the costs of running the Program. *See* Item 20, p.10. Therefore, plaintiffs contend that they are entitled to aggregate their claims with regards to the costs of running the Program. Further, since plaintiffs allege that the cost of running the Program for one year would be approximately $200,000, they contend that, in the aggregate, they meet the minimum jurisdictional requirement with the requisite good faith.

■ The court disagrees with plaintiffs' approach in calculating their alleged common interest in the costs of administering the Program. The amount in controversy in a diversity action is measured strictly

from the plaintiffs' perspective. *See, e.g., Colon v. Rent–A–Center*, 13 F.Supp.2d 553, 558 (S.D.N.Y.1998). The issue of how much Goodyear must spend to administer the Program is irrelevant. To illustrate: it would not help plaintiffs at all if Goodyear would need to spend $500,000 a year to administer the Program, so long as the *value* that each individual plaintiff received was merely $500 a year for approximately thirty years—a value of $15,000.[5]

On the issue of the amount in controversy, plaintiffs rely on *Bass v. Rockefeller*, 331 F.Supp. 945 (S.D.N.Y.1971), *vacated as moot*, 464 F.2d 1300 (2d Cir.1971); and *Black v. Beame*, 550 F.2d 815 (2d Cir. 1977). Both cases are clearly distinguishable from the present action on their facts and do not change this court's analysis of the amount in controversy.

*Bass* involved a class action brought by welfare recipients seeking injunctive relief to restrain the state from reducing the availability of Medicaid benefits. 331 F.Supp. at 947–48. *Bass* differs crucially from the present action, in that the plaintiffs in *Bass* sought to preserve the status quo of a Medicaid trust fund, an actual fund of money. *Id.* at 951. In addition, the court in *Bass* relied heavily on the fact that the members of the plaintiff class had no contractual rights against the defendant. In this action, all members of the plaintiff class have contract rights against Goodyear; this weighs against allowing aggregation. Moreover, the plaintiffs here cannot allege that they are seeking the preservation of an actual monetary fund.

The precedent of *Black v. Beame* is similarly unpersuasive. In *Black*, the plaintiffs were nine siblings who sued the Mayor of New York City over the city government's failure to make adequate efforts to keep their family together. 550

---

**5.** The court notes that there is possibly a *value* to plaintiffs for a Program that will notify them of their tests, repeatedly if necessary, and even encourage their participation. *See* Appendix "A," ¶ 10. Plaintiffs have not raised this theory in their papers. In any

event, "speculative allegations of indirect, nonpecuniary benefits may not be used to meet the amount in controversy requirement." *Black v. Beame*, 550 F.2d 815, 817 (2d Cir.1977) (citation omitted).

F.2d at 816. The plaintiffs alleged that they had a common and undivided interest in the services of a social worker, whose assistance could facilitate the family's reunification. *Id.* at 817–18. Plaintiffs in this action rely on *Black* for the proposition that they too have a common and undivided interest in the professional services of those who administer the Program. The unique facts of *Black*—*i.e.*, a family's interest in reunification—are not present here; and thus the court is also not persuaded by that decision.

The court holds that the plaintiffs in this action may not aggregate their claims against Goodyear. As a result, each member of the class fails to satisfy the minimum amount in controversy for diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Thus, the court must dismiss plaintiffs' action for lack of subject matter jurisdiction.

## II. Rule 12(b)(6): Stating a Claim Upon Which Relief Can Be Granted

Assuming *arguendo* that plaintiffs were able to satisfy the amount in controversy requirement for diversity jurisdiction, they nevertheless fail to state a claim upon which relief can be granted.

### A. *Plaintiffs' Claim and Relief Requested*

■ In their complaint, plaintiffs set forth a narrative description of their claim. Item 1, ¶¶ 22–39. These allegations read like a breach of contract claim, with plaintiffs asking the court to order Goodyear's specific performance.[6] However, plaintiffs have not brought a contract claim because

they claim that they have no adequate remedy at law. To this effect, plaintiffs elaborate in their complaint: "The costs of a program for 558 class members can be determined if the calculation is based on current medical technology. However, it is not possible to predict the impact that advances in medical technology over the next 30 or more years will have on the total future cost for this program." Item 1, ¶ 38. As a result, plaintiffs frame their claim as one for a constructive trust.

■ "Where there exists a 'valid and enforceable written contract governing a particular subject matter,' quasi contractual claims, including claims for unjust enrichment and constructive trust are not allowed." *Rodgard Corp. v. Miner Enterprises,* 1998 WL 864943, at *4 (W.D.N.Y.) (citing *inter alia Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (Ct.App. 1987)); *see also ESI, Inc. v. Coastal Power Production,* 995 F.Supp. 419, 437 (S.D.N.Y.1998) (holding that unjust enrichment and constructive trust apply only in absence of valid and enforceable contract). There is no doubt that the Agreement from *Gibbs* represents a contract between plaintiffs and Goodyear.

Nevertheless, plaintiffs argue that they have no adequate remedy at law because it is not possible to calculate the costs of running the Program over the next thirty or more years. This argument is unpersuasive. Plaintiffs' allegations regarding Goodyear's breach of the Agreement—set forth in paragraph 33 of their complaint—all raise issues of Program administration. The Agreement and Program subject such issues to arbitration.[7] Alternatively, if all

---

6. Pertinently, paragraph 36 of the complaint reads: "Goodyear received the benefit of the bargain that it struck in settling *Gibbs* . . . , but it has failed to provide each *Gibbs* class member with the benefits to which each member is entitled under the settlement [agreement]." Item 1. Furthermore, plaintiffs argue in their memorandum of law, "this action is not a new claim against Goodyear . . . . [T]he plaintiffs seek the restoration of their rights to

benefits under the *Gibbs* settlement [agreement]." Item 20, p. 17.

7. Contracts to arbitrate cannot be avoided by allowing one party to ignore the contract and resort to the courts. *See Southland Corp. v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). In its supporting affidavit, Goodyear states that all of their alleged breaches of the Agreement, *see* Item 1, ¶ 33, are either

that the plaintiffs actually seek is the proper administration of the Program, then plaintiffs' proper remedy is specific performance of the Agreement. To this proposition, plaintiffs offer:

> Specific performance would be tedious, time-consuming and expensive [for the parties]. It would require the Court's supervision and intervention on nearly a monthly basis for years on end.... The Court would need to invest considerable time and resources in order to supervise its decree. Fortunately, there is a more feasible equitable remedy.

Item 20, pp. 3–4.

The fact remains, though, that the Agreement is a valid and enforceable contract. In fact, the basis of plaintiffs' action is that their rights would be vindicated if the Program were properly administered. Plaintiffs concede that specific performance of the Agreement is an available, albeit undesirable, remedy. This is fatal to plaintiffs' ability to state a claim upon which relief may be granted, because plaintiffs have implicitly recognized the existence of a valid and enforceable contract.

Settled law indicates that the equitable claims of unjust enrichment and constructive trust are unavailable where plaintiffs have rights under a valid and enforceable contract. *See Rodgard Corp.*, 1998 WL 864943, at *4; *see also Coastal Power*, 995 F.Supp. at 437 (holding that unjust enrichment and constructive trust apply only in absence of a valid and enforceable contract). Plaintiffs urge the court to ignore

the Agreement because their remedies at law are inadequate. This does not negate the fact that the plaintiffs are essentially asking for enforcement of the Agreement and proper implementation of the Program. Nor does it negate the fact that the Agreement is a valid and enforceable contract governing the *precise* subject matter of this dispute—*i.e.*, the Program. As such, the plaintiffs, in stating a claim for a constructive trust, have failed to state a claim upon which relief can be granted.

C. *Plaintiffs Fail to Allege the Factors Needed for a Constructive Trust*

However, even if the court were to allow plaintiffs to pursue the equitable claims of unjust enrichment and constructive trust despite the presence of an enforceable and valid contract, plaintiffs still fail to state a claim for a constructive trust.

■ New York State law, which under the *Erie* doctrine [8] controls in this diversity action, provides that there are four elements to a claim for a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment. *United States v. Coluccio*, 51 F.3d 337 (2d Cir.1995) (citing *In re: Koreag, Controle et Revision, S.A.*, 961 F.2d 341, 352 (2d Cir.), *cert. denied*, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992)).

1. *Allegations of "promise" and "unjust enrichment" are satisfied.*

Both plaintiffs and Goodyear seem to agree that the second prong of the test for

---

now moot or are subject to arbitration under the Agreement and Program. *See* Item 18, Ex. C, p. 9, ¶ 5; Item 18, Ex. D, ¶¶ 7–8 (containing the Agreement and the Program). Plaintiffs counter that Goodyear's violations of the Agreement were never contemplated by the Agreement and are beyond the scope of the Agreement's terms. Yet even if the plaintiffs were correct on this point, the court's analysis would not change. If the current alleged breaches of the Agreement are in fact beyond the Agreement's scope, then the plaintiffs would have failed to bargain for the relief that they seek here. Thus, the plaintiffs

would have to enter into a supplementary agreement in order to secure new and different rights against Goodyear. The court does not somehow gain jurisdiction over the matter by virtue of plaintiffs' failure to bargain for the relief that they now seek. In any event, this issue is irrelevant for the reasons the court sets forth *infra*.

8. *See e.g., Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (citing to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

alleging a constructive trust is satisfied because Goodyear did promise plaintiffs to provide the Program. As for the "unjust enrichment" prong, the court should assume for the purposes of this analysis that the plaintiffs may adequately allege Goodyear's unjust enrichment. The court should make that presumption because if the court were to take its analysis this far, the court would have already found that the equitable claims of unjust enrichment and constructive trust are available to plaintiffs.

### 2. *Plaintiffs fail to allege a confidential or fiduciary relationship.*

█ Plaintiffs first argue that Goodyear and they were in a confidential doctor-patient relationship. Plaintiffs reason that this confidential relationship existed between the two parties because Goodyear had established a program of medical surveillance for the class members before it entered into the Agreement. *See* Item 20, p. 19. It is beyond the court's understanding how Goodyear, a corporation that manufactures tires, could be involved as a "physician" in a doctor-patient relationship. As a matter of law, there was no confidential relationship between Goodyear and plaintiffs.

█ There was also no fiduciary relationship between the plaintiffs and Goodyear. "The essential feature of a fiduciary relationship is reliance by one party on the integrity or discretion of another . . . ." *A Brod v. SK & I*, 998 F.Supp. 314, 327 (S.D.N.Y.1998). In the present action, plaintiffs admit that they were represented by "competent counsel" in reaching the Agreement. Item 1, ¶ 18; *see also* Item 18, Ex. C, p. 12, ¶ 11. A relationship that is characterized by an arms-length contract, which was negotiated by attorneys, is not the stuff of fiduciary relationships. Indeed, plaintiffs all but concede that no fiduciary or confidential relationship existed between Goodyear and the plaintiffs. Item 20, p. 19.

### 3. *Plaintiffs cannot adequately allege that there was a "transfer."*

█ In addition, plaintiffs fail to allege an adequate "transfer." Plaintiffs allege in their complaint that they relied on Goodyear's representations that it would provide the Program when they "agreed to *transfer* the obligation to fund a medical monitoring program from the primary defendants to Goodyear." Item 1, ¶ 30 (emphasis added). As a threshold matter, plaintiffs have mischaracterized the primary defendants' *potential* liability in *Gibbs* as an "obligation." The plaintiffs agreed to drop their claims against the primary defendants and, in turn, the primary defendants agreed to drop their third-party claims against Goodyear. Thus, plaintiffs transferred to Goodyear only the value of their *claims* against the primary defendants.

Having said that, plaintiffs also fail because they allege a kind of "transfer" that does not comport with the kinds of transfers at issue in most every case involving a constructive trust. That is, the property transferred—plaintiffs' *claims* against the primary *Gibbs* defendants—cannot be made the object of a constructive trust. One court has gone so far as to suggest that "[i]t is elementary . . . that before a constructive trust may arise, there must be a *res*—a segregated fund or property—to which the trust can attach." *Aldrich v. Redington*, 605 F.2d 590, 597 (2d Cir.1978); *see also United States v. Coluccio*, 51 F.3d 337, 340–41 (2d Cir.1995) (noting requirement of transfer of "subject res" prompting court to hold that mother of criminal defendant could seek constructive trust over cost bond for which she paid); *United States v. Ribadeneira*, 105 F.3d 833, 837 n. 5 (2d Cir.1997). The court cannot conceive of how plaintiffs would attach a constructive trust to the *Gibbs* primary defendants' "obligation to fund a medical monitoring program."

However, plaintiffs argue that they are not obligated to point to an identifiable *res* in order to find that there has been a

"transfer." *See* Item 20, p.22; *Simonds v. Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 362, 380 N.E.2d 189 (1978). Plaintiffs argue alternatively that further discovery may show that Goodyear actually created an identifiable *res* to fund the Program. Item 20, p. 22. Plaintiffs' arguments on these points are unavailing. Again, plaintiffs do not seek to attach the "property" that they allegedly transferred to Goodyear—*i.e.,* their claims against the primary defendants. Instead, they seek to attach whatever funds Goodyear may or may not have set aside to fund the Program. These two properties are, if nothing else, distinct entities.

*4. Plaintiffs' claim defeated by failure to allege two elements of constructive trust.*

Plaintiffs argue that New York courts have regularly imposed a constructive trust in the absence of one of the four factors enumerated above when "the other conditions [are] met and equitable considerations warrant[ ]" the imposition of a constructive trust. *In re: Koreag, Controle et Revision, S.A.,* 961 F.2d 341, 353 (2d Cir.1992) (holding that absence of fiduciary relationship did not defeat constructive trust claim if equity "otherwise required"). It is true that New York courts have consistently held that the doctrine of constructive trusts is to be applied flexibly; that the court should have the discretion "to apply this remedy to whatever knavery human ingenuity can invent." *Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 363, 380 N.E.2d 189 (1978) (quoting *Bogert Trusts and Trustees*).

Yet, even if plaintiffs could maintain a claim for a constructive trust in the absence of a confidential or fiduciary relationship, they cannot do so in the added absence of a proper "transfer." Plaintiffs fail to state a claim upon which relief can be granted because they have not satisfied two of the four prongs in the controlling test. In any event, it seems unnecessary for the court to proceed this far in its

analysis, since the existence of a valid and enforceable contract regarding the subject matter of this dispute precludes the unjust enrichment and constructive trust claims.

## CONCLUSION

The court has not retained ancillary jurisdiction over the *Gibbs* Agreement. Furthermore, the plaintiffs fail to satisfy the minimum amount in controversy required for diversity jurisdiction. Finally, plaintiffs fail to state a claim upon which relief can be granted. For these reasons, the court grants Goodyear's motion to dismiss plaintiffs' action.

So ordered.